**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ICON HEALTH & FITNESS, INC., )
)
Plaintiff, )
) C.A. No. _____
v. )
) JURY TRIAL DEMANDED
PELOTON INTERACTIVE, INC. )
)
Defendant. )

**ICON HEALTH & FITNESS, INC.'S COMPLAINT FOR**
**WILLFUL PATENT INFRINGEMENT**

Plaintiff ICON Health & Fitness, Inc. ("ICON") hereby complains against defendant

Peloton Interactive, Inc. ("Peloton") as follows:

**PARTIES**

1.      ICON is a corporation organized and existing under the laws of Delaware with its

principal place of business located at 1500 South 1000 West, Logan, Utah 84321.

2.      Peloton is a corporation organized and existing under the laws of Delaware with

its principle place of business located at 158 West 27th Street, New York, New York 10001.

**JURISDICTION AND VENUE**

3.      This is an action for willful patent infringement pursuant to 35 U.S.C. § 271 *et*

*seq.*

4.      This Court has subject matter jurisdiction over the patent claims pursuant to

28 U.S.C. §§ 1331 and 1338.

5.      Peloton is incorporated in this District, and Peloton has purposefully availed itself

of the benefits and protections of the laws of the State of Delaware.

6.     Peloton intends to and does promote, use, offer for sale, and sell the infringing products and services described herein to customers in this District.

7.     Peloton advertises, markets, sells, and offers its products and services through its websites, which advertising, marketing, selling, and offerings are available to the purchasing public across the United States, including in this District.

8.     This Court's exercise of personal jurisdiction over Peloton is consistent with the Constitutions of the United States and the State of Delaware.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1400 because Peloton resides within this District and has committed, and continues to commit, acts of patent infringement within this District.

## **INTRODUCTION**

10.     Peloton's playbook is straight forward: copy and misappropriate the innovations, inventions, and creations of others, take the credit, and then attempt to bury its wrongdoing in litigation. This is not the first action ICON has had to bring, or that others have brought, to police Peloton's misappropriation of intellectual property.

11.     In an industry where innovation is critical to success and survival, ICON began building its business in 1977 upon creativity, investment, and hard work. This led to a stable, inventive, and diversified fitness company built upon hundreds of industry-leading patents and the most well-known brands in the industry, including NordicTrack®, ProForm®, and iFIT®.

12.     Many of its industry-leading patents allowed ICON to be the sole provider of treadmills, exercise bikes, rowers, ellipticals, and cabled strength machines with a remote-control feature for nearly 20 years. ICON invested a tremendous amount of time and resources to develop the ground-breaking remote-control technology nearly 20 years ago, and it has

continued to invest in further generations of this technology. ICON must protect that investment and the patent rights it has been granted—and expects to still be granted in the future—against infringers like Peloton.

13.     Seeing the massive business opportunity to capture market share and subscribers during the unprecedented demand created by the COVID-19 pandemic, Peloton wasted no time. Peloton utilized its preferred way of "technological innovation"—it simply copied technology developed by others (in this case, ICON's) and marketed it as its own. With the introduction of its Bike+ exercise bike, Peloton added new features that did not exist on its original Bike: (1) its so-called Auto-follow feature that remotely controls the resistance of the bike and (2) a swiveling screen to improve off-bike exercises. Both of these "innovations" were developed and used by ICON well before Peloton. Peloton's Auto-follow feature is covered by ICON's patent, and ICON has a patent pending on the swivel screen that claims priority years prior to Peloton's use.

14.     As the fitness industry's leading innovator, ICON is unfortunately accustomed to having companies copy its technology. Some companies, like Peloton, have built (at least in part) entire businesses on the back of ICON's patented technology.

15.     Peloton recognized ICON's position in the market, which is why its founder and CEO, John Foley ("Foley"), traveled to meet with ICON at its headquarters in July 2013, seeking an opportunity to use ICON's patented technology. This meeting was before Peloton's Bike design was finalized and before Peloton had sold and shipped even a single exercise bike. ICON declined to license Peloton at that time. Foley was warned at that meeting and subsequent meetings against infringing ICON's patents.

16.     Since its inception, Peloton has demonstrated a pattern of copying ICON's innovations. In 2016, ICON was forced to sue Peloton for patent infringement based on its first

and then only product, the Peloton Bike. The patents asserted in that case related to ICON's innovative iFIT connected fitness patents. That case was resolved. ICON has also been forced to counterclaim against Peloton for patent infringement on Peloton's Tread product. That case is currently pending in this Court, *Peloton Interactive, Inc. v. ICON Health & Fitness, Inc.*, CA No. 20-662-RGA.

17.     Now, with the recent release of its Bike+, Peloton has copied ICON's innovations again. This time using ICON's patented interactive connected technology that allows for remote control, its patented interactive integrated weight system, and ICON's patent pending swiveling display. Peloton's pattern of infringement has been no accident, as shown below.

## BACKGROUND

### ICON'S iFIT TECHNOLOGY PRE-DATES PELOTON BY OVER A DECADE

18.     Peloton recently sued ICON claiming it is an innovator and inventor. Peloton has even tried to claim it is more innovative than Apple: "We are a very, very hardcore technology company. We make a tablet computer better than Apple . . . [w]e are as hardcore of a tech shop as anything in NYC right now." Peloton may be a successful marketer, but its self-granted title of "innovator" is simply inaccurate. ICON was the first to develop and commercialize interactive connected technology that allowed in-home, live, and on-demand instructor led classes with competition and leaderboards (i.e., iFIT) at least 12 years before Peloton was founded.

19.     ICON demonstrated its first iteration of iFIT in the late 1990s at a well-known fitness sporting goods, team sport, and fitness tradeshow called the Atlanta Super Show at the Georgia World Congress Center. For that show, ICON created a remote studio-based treadmill class that was led by an instructor located at ICON's headquarters in Utah and presented remotely to class participants in Atlanta. The instructor led the remote users through a treadmill

class, and the speed and incline of the users' treadmills was remotely controlled by the instructor in Utah. Nothing like this had been seen in the fitness industry.

20.     In an October 19, 1999 press release, titled "Turn Your Treadmill Into an Internet Appliance with www.iFit.com," ICON stated: "Friends who want to compete against each other can 'schedule a race' on the site, start simultaneously, and their iFit.com treadmills will send data that will post and update each competitors' position on the course in real time, for everyone to see." In the same press release, ICON also stated that "[c]onsumers can easily access an iFit.com workout by choosing a live, web-based session with a personal trainer, engaging in live, online competition or selecting from a database of 'streamable' workouts."

21.     The first iteration of iFIT was but the beginning of what it would become over the next several years. In February 2000, iFIT was named the "Most Innovative Product" by Sports Authority, then the nation's largest sporting goods retailer.  ICON continued to develop its iFIT technology through intense research, development, and ingenuity.

22.     Not only did ICON have an operational interactive competitive fitness platform before Peloton, but ICON's platform offered more innovative features than Peloton and continues to do so today. For example, iFIT allows for scaling of exercise parameters, including its much-anticipated, patent pending Active Pulse and Adaptive Training scaling. ICON's platform allows a user to create her own outdoor route with Google Maps, the exercise device displays real-world images from Google, and the device mimics the actual terrain of the route by varying resistance or incline. iFIT also offers interactive real-world outdoor cycling, running, and hiking workouts. iFIT devices also allow for remote control of a device's operating parameters so a trainer can remotely control a user's device. ICON's bikes also change elevation

by inclining or declining depending on whether the user is riding up or down an incline. Peloton's platform did not offer any of these features, until its recent infringement.

23.     In addition to ICON's actual innovation and sale of interactive connected fitness devices, ICON obtained hundreds of patents on these systems before Peloton was founded. ICON has filed around 120 iFIT patent applications with priority dates that predate Peloton. These patents are a result of years of innovation, investment, and hard work that developed iFIT from its first iteration demonstrated at the Atlanta Super Show into a full suite of interactive connected fitness offerings that include the four pillars of fitness: exercise, nutrition, activity, and sleep.

**PELOTON TRIED TO GAIN ACCESS TO iFIT TECHNOLOGY AND WAS WARNED OF INFRINGEMENT BEFORE PELOTON FINALIZED AND SHIPPED ITS BIKES**

24.     ICON's leading presence in the interactive connected fitness market has not gone unnoticed by Peloton. As mentioned above, Peloton's co-founder and CEO, Foley, traveled to ICON's headquarters and met with ICON executives in July 2013, seeking access to ICON's technology before Peloton shipped a single bike. But ICON was not willing to provide rights to its technology to Foley.

25.     Foley was warned at that meeting, and in subsequent meetings and communications, not to infringe ICON's patents. But this did not stop Peloton. Instead, Foley and Peloton forged ahead anyway, forcing ICON to file in 2016 the patent infringement lawsuit mentioned above, which was resolved in 2017.

26.     After the 2016 patent infringement lawsuit brought by ICON, Peloton developed and launched an additional infringing product, its "Tread" product, and it commenced a marketing and public speaking campaign that was designed to deceive consumers and investors about Peloton's product offerings, its so-called innovation in being first to market, and the lack

6

of any competitors in the market. Peloton sought the media's attention to harm ICON and to deceive consumers and investors.

27.     In reality, Peloton has copied important aspects of its platform from ICON. Peloton has misappropriated ICON's technology, bundled it with—sometimes false—advertising, and then claims to the market that it is an innovator. Peloton's copying and misappropriation is not limited to ICON's technology; for example, Peloton also was accused of infringing artists' music rights and was sued for $300 million.

**PELOTON'S FALSE AND MISLEADING STATEMENTS CONCERNING INNOVATION**

28.     In addition to the statements discussed above about being a "very very hardcore technology company" and that Peloton makes "a tablet computer better than Apple," Peloton has made many other public statements about being an innovator and "building something that's the first of its kind."

29.     Peloton is not the innovator it claims, and it is sitting on only a handful of weak patents of questionable validity. When Peloton first tried to enforce its patents it was met with arguments they were invalid. Flywheel, the defendant in Peloton's first patent infringement test case, challenged the patents using ICON's '730 Patent. The Patent and Trademark Board agreed, stating that ICON's '730 Patent, in combination with another, showed a reasonable likelihood that Peloton's challenged patent claim was unpatentable.

30.     Peloton could see the writing on the wall, and that it would soon be exposed as a "tech company" without any valid patents and that all of its public statements about being the innovator and the "first of its kind" would fly back in its face. Peloton was desperate at this point. It had represented to consumers and the market that Peloton was an innovator with patents. Peloton knew it had been denied access to ICON's technology early on and had been sued by

ICON for patent infringement. Peloton knew the loss of its patents, again based largely on an ICON patent that pre-dates Peloton, would expose its market deception.

31.     So, in a case where Peloton was the plaintiff and seeking damages against Flywheel, on information and belief *Peloton paid* millions of dollars to Flywheel to force it out of the market and coerce Flywheel to sign a declaration stating that it had copied Peloton and infringed upon its patents. Also, on information and belief, Peloton tried to cover-up the fact that its very first test case seeking to enforce its patents had backfired and it was going to publicly lose patent rights. So, Peloton paid for Flywheel's silence and cooperation.

32.     Peloton will likely hide behind a confidential settlement agreement with Flywheel to avoid public disclosure of these facts. But what it cannot hide from the public are disclosures in its public filings that it paid $59 million in legal settlements during the time it settled the Flywheel case.

## ICON'S PATENTED REMOTE AND AUTOMATIC CONTROL OF EXERCISE DEVICES

33.     ICON's patented automatic and remote-control features have been, and continue to be, highly valued features that drive demand for its products. Media outlets consistently list ICON's automatic and remote-control technology as a strong reason to buy ICON products. Others have recognized that ICON branded fitness equipment offers remote control that was absent from Peloton's products until introduction of the Bike+.

34.     Bustle published an article titled "Reviewers Swear by this Bike that Rides *Just* Like a Peloton—at a Fraction of the Cost." This article stated that the original Peloton Bike was extremely expensive, and specifically noted that the NordicTrack S22i Commercial Studio Cycle was the "overall best" bike, providing that "[o]ne major plus for the NordicTrack over the Peloton: When you're taking in a studio workout, trainers can control your incline, decline, and resistance in real time . . ."

8

35.     ZDNet published an article detailing the best home gym fitness equipment in 2020 (before the announcement of Peloton's Bike+, which includes infringing features), noting that "[t]he NordicTrack Commercial S22i Studio Cycle . . . can uniquely control your machine's decline, incline, and resistance in real-time—something Peloton trainers can't do."

36.     ICON has been the sole provider of treadmills, exercise bikes, rowers, ellipticals, and cabled strength machines with this remote-control feature for nearly 20 years. ICON has held this position based on its robust patent portfolio.

**BIKE+ IS THE MOST RECENT EXAMPLE OF PELOTON'S PATTERN OF COPYING ICON'S TECHNOLOGY**

37.     Peloton began offering the Bike+ on September 9, 2020, which incorporates ICON's patented remote-control as the key new feature. Peloton calls this new feature "Auto-follow" and it automatically adjusts the bike's resistance to match an instructor's call-out. The Bike+ also includes a swiveling touchscreen—copied from ICON—as the other key feature.

38.     Peloton's Auto-follow feature automatically adjusts the resistance during class transitions (i.e., when the instructor calls out a different resistance range, Auto-follow will automatically adjust the resistance to follow). A vibration on the handlebar will indicate a transition of resistance.

39.     With just the addition of the Auto-follow, the swiveling screen, and a couple other features, Peloton now sells its Bike+ at $2,495 compared to its original Bike now at $1,895. That is a premium of $600 per bike, presumably based on the addition of features copied from ICON.

40.     In the short amount of time since its release, Bike+ consumers and media outlets are praising Peloton's Auto-follow feature—apparently unaware that Peloton, rather than innovating, is actually infringing ICON's longstanding intellectual property rights.

41.     Women's Health Magazine published a review of the Bike+ and highlighted the Auto-follow function, with the reviewer stating that "IMO, the raddest feature of all is the new Auto-Follow function. Like magic, when your instructor suggests a resistance range (how hard or easy it feels to pedal), the bike adjusts accordingly." The Women's Health reviewer goes on state that she is "hooked on this feature."

42.     Men's Health Magazine published a review of the Bike+, calling the Auto-follow feature a "game-changer." The Men's Health reviewer highlights the Auto-follow feature, stating that it is "an intensity game-changer" and that it "is also a brilliant way to limit the mental self-talk that's usually going on in my head." There are other similar reviews.

43.     In addition to the praise for the infringing Auto-follow feature, media outlets are also highlighting the swiveling screen as well.

44.     Forbes reviewed the Bike+ and called the swiveling screen (along with the Auto-follow feature) a "crucial feature." Forbes characterizes this feature as "much more important now [that] Peloton creates all kinds of exercise classes, not just spin-style ones." (https://www.forbes.com/sites/andrewwilliams/2020/09/08/peloton-bike-adds-four-crucial-features-one-just-for-apple-watch-owners/#5ac70316476a).

45.     Market Insider also published an article titled "the 5 coolest features of Peloton's new $2,500 premium bike, from a rotating high-definition screen to automatic resistance control." Yet again, the swiveling screen, along with the infringing Auto-follow feature, is called out as one of the "coolest features" on the Bike+. (https://www.businessinsider.com/5-of-the-coolest-features-of-pelotons-new-premium-bike-2020-9#rotating-high-definition-touch-screen-1).

46.     ICON's swiveling screen is patent pending and was used by ICON long before Peloton's Bike+. Below is an advertisement of ICON's swiveling screen feature that pre-dates Peloton's use:



47.     The Auto-follow feature and the swiveling screen were both used by ICON before Peloton and are the subject of granted and pending patents.

**PELOTON COPIED AND IMPLEMENTED ICON TECHNOLOGY TO CAPTURE AN UNPRECEDENTED MARKET DEMAND**

48.     ICON has seen the demand for its interactive connected fitness products (iFIT subscriptions and iFIT enabled equipment) explode over the past few years. Consumers are looking for on-demand and convenient access to expert training, interactive competition, a large library of potential workout classes and routines—all from the comfort of their homes. ICON had its most successful Black Friday sales event ever in 2019 and was experiencing impressive growth.

49.     The demand for ICON's interactive and connected fitness products accelerated at record paces during the pandemic. This increased demand occurred industry wide and caused a

surge in sales at a level not seen in the industry. As posted on Businesswire.com, the home fitness industry saw a 170% annual growth rate as early as May 2020, and that figure has continued to increase since. The same posting announces that "[d]emand has been particularly high for smart exercise equipment and companies that offer online fitness programs as consumers try to replicate the gym experience at home." And, that "Peloton has seen increasing demand for their exercise bike and has responded by offering contact-free delivery of fully assembled units and a free 90 day trial of its workout classes."

50.     Peloton confirmed the substantial surge in its business during its recent September 10, 2020 earnings call when Foley, its CEO, stated that "[t]he strong tailwind we experienced in March as the COVID-19 pandemic took hold has continued to propel demand for our products into fourth quarter and first couple months of Q1 fiscal year 2021." This "strong tailwind" of demand was so extraordinary that Peloton could not keep up with demand and it accumulated a "significant backlog of bike delivery."

51.     In addition to the substantial increase in its hardware (i.e., bike and treadmill sales) Peloton's subscriber base also grew by 113% during the pandemic, and its subscription engagement skyrocketed up 333% year-over-year. This equated to "nearly 25 average workouts per Connected Fitness subscription" user per month compared to the 12.0 workouts per subscription per month in the fourth quarter of last year." In other words, Peloton was experiencing unprecedented demand created by the pandemic.

52.     Based on Peloton's public filings, it had not experienced such growth, demand, and subscriber engagement ever in its history as a public company. If Peloton were ever going to act and do something quickly to capture a massive amount of market share, now would be the time.

53.     And that is exactly what Peloton decided to do. Peloton made a conscious decision to willfully infringe ICON's patented technology so it could introduce a new "game changing" technology to appropriate market share and otherwise irreparably harm ICON during this market boom.

**PELOTON ALSO COPIED ICON'S PATENTED INTERACTIVE INTEGRATED WEIGHT SYSTEM**

54.     An important feature of the Peloton user interface is an unauthorized use of ICON's patented interactive integrated weight system depicted below.



55.     The timeline informs the user by icon and text where she is in the workout by showing elapsed time and time remaining, as well as the type of workout being performed (e.g., cycling, weights, or some combination of exercises).

## COUNT I

### (Infringement of the U.S. Patent No. 7,166,062)

56.     By this reference ICON realleges and incorporates the foregoing paragraphs as though fully set forth herein.

57.     The '062 Patent was filed on August 18, 2000 and issued on January 23, 2007. ICON's employees are the inventors, and it is the owner by assignment of the '062 Patent.  A copy of the '062 Patent is attached hereto as Exhibit A.

58.     The '062 patent is an improvement over the prior art because it discloses and claims a system that allows exercisers to experience the same enjoyment of competition you could find in a health club group class, such as a "spinning class" with stationary exercise cycles, from the comfort of their own home and seeks to solve the problems of exercise boredom, lack of motivation, or lack of engagement that often plagues exercise devices. This is accomplished through (1) "exercise devices that are capable of simulating a group or class workout environment and synchronizing operation of the exercise devices" ('062 Patent at 2:30–33) and (2) "exercise devices that are capable of being controlled by packetized signals" received from a remote source ('062 Patent at 3:35–35).

59.     It was not well-understood, routine, or conventional at the time of the filing for the '062 Patent for an exercise device, such as a stationary bike or treadmill, to enable interaction of a user by having the exercise device receive packetized signals from a remote source over a network configured to control operating parameters of the exercise device. This improvement of the '062 Patent and its disclosures allow a user to experience a trainer-led and controlled exercise class that is delivered from a remote source over a network, creating the luxury of sophisticated exercise training from an at-home exercise device. This was an advancement over prior art health club group classes or at-home exercise devices.

60.     The '062 Patent also provides an exercise device with enhanced features such as "scaling control" where, for example, "user may define a maximum limit for one or more of the operating parameters of the device, such that transmitted programming is limited in accordance

with the maximum values defined for each operating parameter." ('062 Patent at 48:11–15). This type of remote control with a scaled choice defined by the user or a remote system was not well-understood, routine, or conventional at the time. This provides a more tailored version of remote control for a particular user in trainer-led group workouts.

61.     Peloton imports, makes, uses, sells, and offers to sale the Peloton Bike+ which has an associated tablet computer console.

62.     Peloton also imports, makes, uses, sells, and offers to sell software associated and for use with its Peloton Bike+ to provide online streaming of workouts, including workouts that allow for the Auto-follow feature. This software is known as the Peloton App and it is incorporated into the tablet computer console provided with the purchase of the Peloton Bike+ and is available, in addition to the incorporated tablet computer, for at least the iOS and Android platforms.

63.     Peloton's Bike+ and associated software is an exercise device configured to enable interaction of a user and comprises an exercise device having one more operating parameters, at least one user interface device gathering a first signal from the user; a communicating mechanism for receiving a packetized second signal from a remote source over a network that includes one or more packetized control signals; and a controller, responsive to the packetized second signal, configured to control the operating parameters of the exercise machine. Peloton's Bike+ further comprises a scaling control, the scaling control being configured to enable a user to select a value representative of the proportional change to be made to the packetized control signal.

64.     Peloton imports, makes, uses, sells, or offers for sale its Bike+ and software within the United States and within the State of Delaware, either directly or through established distribution channels.

65.     Peloton has had notice of the '062 Patent and its applicability to the Peloton Bike+ Auto-follow feature since at least its initial meeting with ICON in or about 2013. And Peloton has even cited the '062 Patent in its own patent filings, including on March 4, 2014 during the prosecution of U.S. Patent No. 9,174,085.

66.     Peloton has infringed and continues to infringe one or more claims of the '062 Patent, including claim 47, by making, using, selling, offering for sale within the United States, or importing into the United States products, systems, or services, including, but not limited to the Peloton Bike+ and Peloton App.

67.     Peloton provides instruction to users of Peloton's Bike+ and associated Peloton App, through user manuals and online through its websites, on how to use Peloton's Bike+ in a manner infringing one or more of the claims of the '062 Patent.

68.     ICON alleges on information and belief that users of Peloton's Bike+ infringed and continue to infringe one or more claims of the '062 Patent by using within the United States Peloton's product systems, or services, including, but not limited to, Peloton's Bike+ and associated software, which infringe one or more of the claims of the '062 Patent.

69.     The conduct of Peloton as set forth hereinabove gives rise to a cause of action for direct and indirect infringement of the '062 Patent, pursuant to at least 35 U.S.C. §§ 271 and 281 *et seq*.

70.     Peloton has sold infringing products such as the Peloton Bike+ despite an objectively high likelihood that its actions constitute infringement.

71.     Peloton's infringement of the '062 Patent will continue to damage ICON's business, causing irreparable harm, for which there is no adequate remedy at law, unless it is enjoined by this Court.

72.     Peloton's acts of infringement have caused damage to ICON.  Thus, in addition to injunctive relief, ICON is entitled to recover the damages sustained as a result of Peloton's wrongful acts in an amount subject to proof at trial.

73.     Peloton has willfully infringed the '062 Patent, entitling ICON to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

74.     By reason of the foregoing, ICON is entitled to relief against Peloton, pursuant to at least 35 U.S.C. §§ 283–85.

## COUNT II

### (Infringement of the U.S. Patent No. 10,293,211)

75.     By this reference ICON realleges and incorporates the foregoing paragraphs as though fully set forth herein.

76.     The '211 Patent was filed on March 18, 2016 and issued on May 21, 2019. ICON employees are the inventors and it is the owner by assignment of the '211 Patent.  A copy of the '211 Patent is attached hereto as Exhibit B.

77.     The '211 Patent discloses and claims technology that is an improvement over prior art in that it provides for an exercise apparatus with seamless integration of aerobic and anaerobic exercise with a "free weight cradle [] incorporated into a treadmill, an elliptical trainer, a stepper machine, a stationary bicycle, a rowing machine" etc. ('211 Patent 5:48–50). The novel claimed apparatus allows for a user to "to mix up the anaerobic exercise and aerobic exercise

portions of his or her workout. During the anaerobic portions of the workout, the tread belt may be stopped while the user performs the free weight exercises. When the anaerobic portion of the workout is completed, the user may resume the operation of the tread belt to perform an aerobic portion of the workout. In other examples, the user may want to use the free weights while the tread belt is in operation. For example, the user may want to carry dumbbells during a run." ('211 Patent at 6:25–35.) The claimed apparatus also includes delivery and display of a programmed workout in which "the treadmill guides the user with a programmed workout. In some cases, the programmed workout alters the tread belt's speed, the incline of the deck, and other factors affecting the aerobic portion of the workout. Additionally, the programmed workout may include anaerobic portions as well. In these instances, the programmed workout may instruct the user to perform certain types of lifts with the free weights." ('211 Patent 6:45–52.) It was not well-understood, routine, or conventional at the time of the '211 Patent for this type of apparatus that provides a new solution for a diverse and streamlined workout routine at home that is also time and space-conscious.

78.    Peloton's Bike and Bike+ and associated apps are each an exercise apparatus comprising a stationary bicycle including pedals, a free weight assembly incorporated into the stationary bicycle, the free weight assembly including: a cradle; a free weight removable from the cradle, a processor configured to determine a time to instruct a user to remove the free weight and perform a set of repetitions of a type of life with the free weight according to a programmed workout, a display screen configured to indicate when the time arrives, according to the programmed workout; and a speaker configured to broadcast audio commands to remove the free weight and perform the set when the time arrives according to the programmed workout. Peloton has the display screen incorporated into a console of the stationary bicycle.

79.     Peloton provides instruction to users of Peloton's Bike and Bike+ and associated Apps, through user manuals and online through its websites, on how to use Peloton's Bike and Bike+ and associated Apps in a manner infringing one or more of the claims of the '211 Patent.

80.     Peloton has infringed and continues to infringe one or more claims of the '211 Patent, including claim 16, by making, using, selling, offering for sale within the United States, or importing into the United States products, systems, or services, including, but not limited to the Peloton Bike and Bike+ and Peloton App which embody one or more of the claims of the '211 Patent.

81.     ICON alleges on information and belief that users of Peloton's Bike and Bike+ infringed and continue to infringe one or more claims of the '211Patent by using within the United States Peloton's product systems, or services, including, but not limited to, Peloton's Bike and Bike+ and associated software, which infringe one or more of the claims of the '211 Patent.

82.     The conduct of Peloton as set forth hereinabove gives rise to a cause of action for direct and indirect infringement of the '211 Patent, pursuant to at least 35 U.S.C. §§ 271 and 281 et seq.

83.     Peloton has sold infringing products such as the Peloton Bike and Bike+ and Peloton App despite an objectively high likelihood that its actions constitute infringement.

84.     Peloton's infringement of the '211 Patent will continue to damage ICON's business, causing irreparable harm, for which there is no adequate remedy at law, unless it is enjoined by this Court.

85.     Peloton's acts of infringement have caused damage to ICON.  Thus, in addition to injunctive relief,  ICON is entitled to recover the damages sustained as a result of Peloton's wrongful acts in an amount subject to proof at trial.

86.     Peloton has willfully infringed the '211 Patent, entitling ICON to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

87.     By reason of the foregoing, ICON is entitled to relief against Peloton, pursuant to at least 35 U.S.C. §§ 283–85.

## **PRAYER FOR RELIEF**

WHEREFORE, ICON requests relief as follows:

A.     A judgment finding Peloton liable for infringement of one or more of the claims of the '062 and '211 Patents (the "Asserted Patents");

B.     Orders of this Court temporarily, preliminarily, and permanently enjoining Peloton, its agents, servants, and any and all parties acting in concert with any of them, from directly or indirectly infringing in any manner any claim of ICON's Asserted Patents, pursuant to at least 35 USC § 283;

C.     An award of damages to ICON for infringement of the Asserted Patents, in an amount to be proved at trial, pursuant to all applicable law, including at least 35 U.S.C. § 284;

D.     An award of treble damages to ICON, pursuant to all applicable law, including at least 35 U.S.C. § 284;

E.     A declaration that this case is an exceptional case;

F.     An award of ICON's costs in bringing its action, pursuant to all applicable law, including at least 35 U.S.C. § 284;

G.  An award of ICON's attorneys' fees in its action, pursuant to all applicable law, including at least 35 U.S.C. § 285;

H.  Imposition of a constructive trust on, and an order requiring a full accounting of, the sales made by Peloton as a result of its wrongful or infringing acts alleged herein;

I.  Pre-judgment interest, pursuant to at least 35 U.S.C. § 284;

J.  Post-judgment interest, pursuant to at least 28 U.S.C. § 1961(a);

K.  Any and all other relief to which ICON may show itself to be entitled; and

L.  Such other and further relief as this Court shall deem just and proper.

## JURY DEMAND

ICON hereby demands a jury trial on all issues so triable in this case.

|  | */s/ Frederick L. Cottrell, III* |
|---|---|
| OF COUNSEL: | Frederick L. Cottrell, III (#2555) |
|  | Christine D. Haynes (#4697) |
| David R. Wright | Richards, Layton & Finger, P.A. |
| MASCHOFF BRENNAN GILMORE | 920 N. King Street |
| ISRAELSEN & WRIGHT PLLC | Wilmington, DE 19801 |
| 111 South Main Street, Suite 600 | (302) 651-7700 |
| Salt Lake City, Utah 84111 | cottrell@rlf.com |
| (801) 297-1850 | haynes@rlf.com |
|  |  |
| Sterling A. Brennan | *Attorneys for Plaintiff ICON Health &* |
| Tyson K. Hottinger | *Fitness, Inc.* |
| MASCHOFF BRENNAN GILMORE |  |
| ISRAELSEN & WRIGHT PLLC |  |
| 100 Spectrum Center Drive, Suite 1200 |  |
| Irvine, California 92618 |  |
| (949) 202-1900 |  |

Dated:  October 15, 2020