**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PARK LAWN CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. NO. _____ |
| | ) | |
| PLOTBOX, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Park Lawn Corporation ("PLC") files this Complaint seeking damages and preliminary and permanent injunctive relief against Defendant PlotBox, Inc. ("PlotBox").

## PARTIES

1.      PLC is a foreign corporation organized under the laws of Canada and maintains its United States headquarters at 16801 Greenpoint Park Drive, Suite 376, Houston, Texas 77060.

2.      PlotBox is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business is in Northern Ireland.

## JURISDICTION AND VENUE

3.      This Court maintains federal-question jurisdiction under the Defend Trade Secrets Act ("DTSA") pursuant to 28 U.S.C. § 1331.  This Court maintains supplemental jurisdiction over PLC's state law causes of action pursuant to 28 U.S.C. § 1367 because they relate to PLC's DTSA claim and form part of the same case or controversy.

4.      This Court has general personal jurisdiction over PlotBox because it is incorporated under the laws of the State of Delaware.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because this Court maintains general personal jurisdiction over PlotBox and there is no district in which PLC can otherwise bring the action.

## FACTUAL ALLEGATIONS

### A.      PLC and Its Growth in the Death Care Industry

6.      PLC is a large funeral, cremation and cemetery provider and is the fastest growing company in the death care industry in North America.  Since 2013, PLC has grown from six cemetery properties in Toronto, Ontario to a diverse portfolio of properties and businesses operating across Canada and the United States.

### B.      PLC's Focus of Technology in the Death Care Industry

7.      Since 2018, PLC has devoted significant resources to developing a groundbreaking software technology tool that will strengthen its operations and improve the services it provides its customers.[1]  To this end, over the past 18 months, PLC has invested well over $1M USD to develop a funeral home and cemetery software management program, known as "FaCTS" ("FaCTS" or the "Software"), which it will use to automate and otherwise simplify numerous key aspects of funeral home and cemetery operations.  PLC will soon implement and utilize the Software internally, which will significantly upgrade its existing technology capabilities while also eliminating the cost of third-party systems it currently utilizes.  In addition, PLC will soon market the FaCTS Software for sale/license to other companies in the funeral and cemetery industry.  Marketing the FaCTS Software to the larger funeral and cemetery industry has been at the core of PLC's strategy for developing the FaCTS Software.[2]

---

[1] *See* Exhibit A, Declaration of Jeff Parker.
[2] *Id.*

8.      PLC's development of the FaCTS Software is ongoing.  The FaCTS Software currently includes proprietary features concerning records management, deed management, property management, contract management, accounting reconciliation, and customer interface.[3] As detailed below, PLC treats information related to the FaCTS Software as strictly confidential and proprietary and takes reasonable measures to protect its secrecy.[4]

**C.      Andrew Clark's Involvement in Developing FaCTS**

9.      Andrew Clark became Chairman and Chief Executive Officer of PLC in July 2013. Mr. Clark was integrally involved in PLC's decision to develop FaCTS.  In May 2018, PLC purchased a funeral home and cemetery company based in Houston, Texas called Signature Group. Following that acquisition, Signature Group's two senior executives, J. Bradley Green and Jay Dodds, joined PLC as President and Chief Operating Officer, respectively.  Thereafter, the majority of PLC's operational infrastructure was based out of PLC's Houston, Texas office.  This included operations, sales, information technology, legal, human resources, corporate development/acquisitions, and much of the accounting function.

10.     In June 2018, PLC hired Jeff Parker as the company's Chief Technology Officer. As PLC's CEO, Mr. Clark was involved in and approved the hiring of Mr. Parker.  It was contemplated that Mr. Parker would begin developing a comprehensive software technology tool for internal use and external commercial sale, as described above.  Mr. Clark was well aware of and involved in discussions with Mr. Parker, Mr. Green, and Mr. Dodds about PLC's plans in this regard even before PLC hired Mr. Parker.

---

[3] *Id.*
[4] *Id.*

11.     Beginning in the Summer of 2018, after the acquisition of Signature Group, Mr. Clark met with or otherwise communicated with Mr. Green, Mr. Dodds, Mr. Parker and others about developing the proprietary software, FaCTS.   Notably, Mr. Clark approved the initial plan to start developing PLC's Software, which began with hiring Mr. Parker.

12.     Mr. Clark personally approved the significant initial capital expenditures associated with developing FaCTS shortly after Mr. Parker was hired in June 2018.   In connection with developing FaCTS, Mr. Clark had conversations with Mr. Parker about FaCTS and Mr. Clark became familiar with the design of FaCTS, and the purpose of the design as its relates to PLC's business and the funeral and cemetery industry as a whole.   Mr. Clark also had numerous conversations with Mr. Green and others at PLC about FaCTS and its planned development for commercial sale to other companies in the funeral and cemetery industry.   As a result of his communications with Mr. Parker, Mr. Green and others at PLC, Mr. Clark also became aware of and was involved in discussions about the internal and external release dates for FaCTS, and (to that end) the general operational and marketing strategy surrounding FaCTS.   Mr. Clark had communications with Mr. Parker, as well as Mr. Green, regarding return on investment, marketing plans and the unique features of FaCTS that were being developed, which would make this program fundamentally different, more innovative, and better than other competitive programs currently on the market.[5]

13.     Thus, as PLC's Chairman and CEO, Mr. Clark received extensive and largely unfettered access to all of PLC's confidential and proprietary information and trade secrets, including information and trade secrets relating to FaCTS.   Mr. Clark also possesses proprietary knowledge about PLC's strategy and marketing plans.   The information that Mr. Clark possesses

---

[5] *Id.*

4

relates to a substantial financial investment by PLC and many months of work in developing the FaCTS Software. The information that Mr. Clark possesses is extremely valuable to PLC's competitors, which include, but are not limited to, PlotBox.

**D.     Clark Executed Confidentiality and Non-Compete Agreements with PLC.**

14.     Because of the emphasis that it places on innovation, PLC actively protects its confidential information and trade secrets by, among other things, requiring its employees to sign confidentiality, non-solicitation, and non-compete agreements. PLC also protects its confidential information and trade secrets by restricting access to its computer programs to authorized users who have individual user names and passwords. Mr. Clark executed various agreements with confidentiality and non-compete restrictions as part of his employment with, and separation from, PLC.

15.     Mr. Clark and PLC executed an Amended and Restated Employment Agreement on November 15, 2018 (the "Employment Agreement").[6] In consideration of the confidential information and trade secrets that PLC provided Mr. Clark, and in a reasonable effort to protect PLC's business interests, the Parties executed the Employment Agreement to provide PLC with "more robust restrictive covenants in favour [sic] of [PLC]."[7] Indeed, the Parties entered into the Agreement "on the basis that [Clark] observes the updated restrictive covenants . . . which have been negotiated in good faith and which [Clark] acknowledges as being reasonable."[8]

16.     Pursuant to the Employment Agreement, Mr. Clark promised not to use, divulge, give, or otherwise distribute any of PLC's confidential information.[9] The Employment Agreement broadly defines "Confidential Information" as "all information . . . that relates to the Business or

---

[6] *See* Exhibit B, Declaration of Jennifer Hay.
[7] *See id*. at recital B.
[8] *Id*. at recital C.
[9] *Id*. at § 5.1.

affairs of [PLC] and its Affiliates including, but not limited to, all information related to projects and strategies, marketing and business development plans and techniques, financial information, pricing and billing policies, quoting procedures and all names or lists of clients and suppliers, including independent contractors."[10]  Confidential information, as that term is defined by the Employment Agreement, certainly includes that information to which Mr. Clark received access in connection with FaCTS.

17.    In addition, pursuant to the Employment Agreement, Mr. Clark promised that during the term and the Salary Continuation Period or the Extended Salary Continued Period, as applicable, he would not "directly or indirectly, in any capacity whatsoever, alone, through or in connection with any Person, carry on or be engaged in any endeavour [sic], activity or business which is substantially the same as or in competition with the Business in all or any part of the Restricted Territory."[11]  The Employment Agreement defines "Restricted Territory" as "any area within one hundred (100) kilometers of any establishment in which [PLC] carried on Business during the last twelve (12) months of [Clark's] employment."[12]  "Business" is defined as "the business of Park Lawn Corporation, as carried on from time to time up to the date of the termination of the employment of [Clark],"[13] which includes all types of business conducted by PlotBox.  Finally, Mr. Clark also expressly agreed to be bound by his duties of fidelity and confidentiality that apply to all current and former employees of PLC, which prohibit him from disclosing any confidential information or trade secrets of PLC in furtherance of any new employer.[14]

---

[10] *Id*. at § 1.1 (j).
[11] *Id*. at § 6.1.
[12] *Id*. at § 1.1 (q).
[13] *Id*. at § 1.1 (f).
[14] *Id*. at §§ 2.3, 5.

**E.      Investigations into Mr. Clark's self-dealing as CEO and Chairman of PLC.**

18.      In October 2019, PLC's Board of Directors learned that Mr. Clark had engaged in self-dealing and numerous other unauthorized actions while he was serving as CEO and Chairman of PLC.[15]   The Board formed a Special Committee of four Directors to conduct a formal investigation into Mr. Clark's actions, including an internal review of his expense reports.[16]   As a result of this expense reports review, Mr. Clark was required to reimburse PLC a significant sum of money—in excess of $100,000 CAD—for non-business related expenses.[17]

19.      Among other things, the Special Committee also discovered that Mr. Clark used PLC funds in excess of $1M CAD to purchase a condominium in Toronto for the purported purpose of having a place for the Houston executives to stay during business trips to Toronto.[18]   Mr. Clark, however, never revealed this purchase to the PLC Board and it was, thus, never approved by the Board.[19]   Mr. Clark also never conveyed to the Houston-based executives that PLC had purchased the condominium for their use.[20]   To the contrary, the Special Committee's investigation revealed that Mr. Clark and his girlfriend, Suzanne Cowan, resided in the condominium for a period of time at no cost while Mr. Clark was remodeling his home.[21]

20.      In addition to Mr. Clark's self-dealing, the Special Committee identified numerous "alternative" investments funded by PLC's trust fund accounts, as well as the balance sheet, which were initiated and approved by Mr. Clark without the Board's approval.[22]   These investments include, by way of example: (1) a $4.5M CAD loan to The Dunvegan Hotel in Scotland; (2) a

---

[15] *See* Exhibit C, Declaration of J. Bradley Green at ¶¶ 11–18.
[16] *Id*. at ¶ 11.
[17] *Id*.
[18] *Id*. at ¶ 13.
[19] *Id*.
[20] *Id*.
[21] *Id*.
[22] *Id*. at ¶ 15.

$4.5M CAD loan to a company that owns restaurants and bars in Nova Scotia; and (3) a $3M loan to a bakery through a fund headed by a former PLC employee and personal friend of Mr. Clark.[23]

21.     The Special Committee also learned about Mr. Clark's unapproved involvement with Kahu Capital Partners, Ltd. ("Kahu"), an SEC-Registered Investment Advisor headquartered in New Providence, Bahamas.[24]  Kahu was established only to manage PLC trust fund assets.[25]  At the time the Special Committee learned of its existence, Mr. Clark was already on Kahu's Board of Directors, despite not having previously made the PLC Board aware of his involvement with Kahu or of his plan to have Kahu manage any of PLC's trust fund monies.  The Special Committee also learned that PLC, through Mr. Clark, made a direct investment into Kahu and was paying Kahu substantial consulting fees.[26]  Curiously, the payment of those fees abruptly stopped around the time the Special Committee began its investigation into Mr. Clark.

22.     In April 2020, PLC's Trustee, Argent Financial, informed PLC that an employee of Kahu is under sanctions from the Ontario Commission for a six-year period.[27]  Argent also informed PLC that they were concerned about the sustainability of Kahu due to the fact it only has one client, PLC, and limited employee assets.  As a result, Argent Financial stated that it was unlikely that Kahu would receive approval from their Investment Committee to manage PLC assets; however, at the prior direction of Mr. Clark, Kahu currently has approximately $53M USD of PLC trust fund assets, which were transferred without the Board's formal approval.[28]

---

[23] *Id.*
[24] *Id.* at ¶ 16.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*

**F.     PlotBox Is a Direct Competitor of PLC.**

23.     During the period that Ms. Clark was under investigation by PLC's Board, he was also being actively recruited by PlotBox, a direct competitor of PLC.  Notably, PlotBox purports to sell a cemetery software management program that targets the same group of customers that PLC will target with FaCTS.  The information Mr. Clark possesses about PLC's competing technology will be directly used by PlotBox to immediately and substantially enhance PlotBox's offering, shortcutting significant financial investment and years of development.  Based on publicly available information on its website, the programs that Plotbox offers include features such as records management, deed management, property management, contract management, accounting reconciliation, and customer interface, which are similar to the proprietary features that PLC has included in FaCTS.

24.     PlotBox has known that PLC has been developing a proprietary Software for some time.  With this knowledge, PlotBox intentionally targeted and hired Mr. Clark, in complete derogation of his restrictive covenants.

**G.     PlotBox and Its Recruitment of Mr. Clark**

PlotBox recruited Mr. Clark to become its Chairman while he was still serving as PLC's CEO and Chairman of the Board.  What may have started out as an above-board business discussion about ways in which "PlotBox may be able to help Park Lawn" quickly developed into a concerted effort between PlotBox and Mr. Clark to breach the fiduciary duties that Mr. Clark owed and continues to owe PLC.

25.     Beginning in August 2019 and continuing over the next several months, Mr. Clark attended golf outings and other meetings with then-Chairman of PlotBox's Board of Directors Graham Paterson and other PlotBox executives, including Chief Executive Officer Sean

9

McAllister and Chief Commercial Officer Leona McAllister (together, the "PlotBox Executives"). During this period, Mr. Clark exchanged numerous emails with the PlotBox Executives concerning the "status" of PLC, the cemetery and funeral home market in general, developments in "death-tech," and the prospect of Mr. Clark serving as Chairman of PlotBox's Board of Directors. These emails specifically discussed efforts to contact, and Mr. Clark's actual contact with, PLC's Chief Technology Officer—Jeff Parker—whom Mr. Clark had previously hired for the specific purpose of overseeing and developing a software management system that PLC is developing.[29] Relevant documents and emails follow.

**October 8, 2019:** Mr. Clark meets with PlotBox executives in Scotland.

**October 9, 2019**: Mr. Clark emails PlotBox executives, stating: "I was thinking of a number of angles where we could take this business relationship; all of which are very exciting to me. I look forward to moving this along in the coming weeks and will be in touch shortly following my meeting with ***Jeff Parker*** on 15th October."

**October 18, 2019**: Mr. McAllister emails Mr. Clark, stating: "I wanted to check in and see how the conversation went with ***Jeff***? As a side note I'll be in Texas 9th Dec and then head to Boston 12th Dec, so I would be happy to swing by Houston or Toronto while in the area[.]"

**October 23, 2019**: Mr. Clark emails Mr. McAllister, regarding "Update ***Jeff Parker***", stating: "Unfortunately Jeff and I did not talk last week, as he had a personal issue come up. I'm planning on talking to him later today or Friday and can update you then."

**November 11, 2019**: Mr. McAllister emails Mr. Clark, stating: "I'm planning my itinerary for my trip over the pond WC 8th Dec and wanted to check if you thought it would make sense to swing by Houston or Toronto while we are over?"

Mr. Clark replies: "***Jeff*** is in Toronto today and I will be having dinner with him tonight. Will revert ASAP."

**November 20, 2019**: Mr. Clark to Mr. McAllister, stating: "***Jeff*** is out of town from December 1 to 16. He does think there is considerable merit in a conversation with you, so we'll just need to find a date that works for all."

---

[29] While PLC's investigation pertaining to this litigation is ongoing, PLC has now been able to recover a number of vitally important emails related to PlotBox and Mr. Clark's efforts to communicate with Mr. Parker on behalf of PlotBox.

**December 19, 2019**: Mr. Patterson to Mr. Clark, stating: "I discussed the Chairman role with both management and the wider Board and everyone is very enthusiastic about progressing discussions with yourself[, Mr. Clark]."

**December 28, 2019**: Mr. Clark to Mr. Patterson, stating: "***Jeff*** is planning on being in Toronto early January; however it may be more palatable from a weather perspective to meet at my place in Florida."

**December 28, 2019**: Mr. Clark to PlotBox Executives, stating: "***I have confirmed Jeff will be coming***."

**January 7, 2020**: Mr. Patterson to Mr. Clark, stating: "***As Jeff is going to be there***, and to make the conversation as meaningful as possible, Sean and I were wondering whether it would make sense to have our CTO (Stephen Hardy) over[.]"

**January 26, 2020**: Mr. Clark to PlotBox Executives, stating: "Pease see my proposed agenda for the next couple of days[,]" which included a "Park Lawn Update" and a "Technical Presentation and Discussion."

**March 27, 2020**: Mr. Clark to Mr. McAllister, stating: "Sean . . . I'm speaking with ***Jeff Parker*** after [a board meeting today]. I will update you once I have."

26.      Notably, Mr. Clark communicated with Mr. Parker in late 2019 and early January 2020 to discuss whether Mr. Parker might be interested in moving to "another company" in the event "things did not work out with PLC." These communications were nothing short of solicitation for future employment. And to be clear, this was during a time when Mr. Clark was under investigation by the PLC Board Special Committee. Mr. Parker declined Mr. Clark's solicitations. Nevertheless, throughout this period, Mr. Clark continued speaking with Mr. Parker about FaCTS at the same time he continued to speak with PlotBox about his conversations with Mr. Parker, as demonstrated by the emails above.

## H.      Mr. Clark's Resignation from PLC

27.      As a result of Mr. Clark's misconduct, the Special Committee voted on January 19, 2020 to remove Mr. Clark from his positions of CEO and Chairman of PLC as expeditiously as possible. Mr. Clark was notified of this decision shortly thereafter in late January 2020. On

February 18, 2020, PLC issued a press release publicly announcing that Mr. Clark would stepping down from the CEO and Chairman positions.

28.     Throughout this period,  Mr. Clark never informed the Board that: (i) he had been meeting with a competitor; (ii) he had been discussing the status of PLC; (iii) he had volunteered to serve on PlotBox's Board of Directors; (iv) he had coordinated and attempted to coordinate calls and meetings between PlotBox and PLC's Chief Technology Officer in charge of developing the proprietary software at issue in this litigation; and (v) he had solicited for employment the Chief Technology Officer in charge of developing the software at issue in this litigation.  Accordingly, neither the Special Committee nor the Board of Directors knew that Mr. Clark had been taking actions that were adverse to PLC and for the benefit of PLC's competitor, PlotBox.

## I.     PlotBox named Mr. Clark as the Chairman of Its Board of Directors.

29.     In June 2020, only after Mr. Clark had been serving an as agent of PlotBox for eight months, PLC finally learned about Mr. Clark's affiliation with PlotBox and, specifically, that PlotBox had appointed Mr. Clark to its Board of Directors.  Indeed, PlotBox flaunted Mr. Clark's experience and qualifications with PLC in numerous press releases and other public statements:

- [Mr. Clark] brings an incomparable wealth of experience and strategic vision to the business having led one of North America's largest death care operations, Park Lawn Corporation from July 2013 to March 2020.[30]

- With the scale of operation and speed of growth Park Lawn Corp achieved under [Mr. Clark]'s leadership, his appointment is a particularly strong endorsement for PlotBox.[31]

- [Clark] is a prominent and hugely respected figure in the death care space, having led Park Lawn Corporation form 6 Toronto based locations to over 300 across Canada and the US with an enterprise value of almost $1B.[32]

---

[30]     *See* Exhibit D, June 18, 2020 PlotBox Press Release, PlotBox Announces the Appointment of Andrew Clark as Chairman of the Board.

[31]     *Id*.

[32]     *See* Exhibit E, June 18, 2020 PlotBox Facebook Press Release, https://www.facebook.com/PlotBopx.com, accessed on June 22, 2020 at 2:19 p.m. C.S.T.

30.     Because PlotBox has named Mr. Clark to lead its company in a role in which he will (at a minimum) inevitably disclose and misappropriate PLC's trade secrets and (at most) maliciously misappropriate PLC's trade secrets to the detriment of PLC and in furtherance of PlotBox, PLC files this lawsuit.

## CAUSES OF ACTION

### Count I
### (Violation of the Defend Trade Secrets Act)

31.     PLC incorporates each of the facts and allegations detailed above as though fully set forth herein.

32.     PLC previously employed Mr. Clark as its Chairman and Chief Executive Officer. In that role, Clark received access to its confidential information and trade secrets relating to, among other things, PLC developing its comprehensive funeral and cemetery software management program, FaCTS.

33.     The information to which Mr. Clark received access in connection with FaCTS includes, but is in no way limited to, information concerning the purpose of FaCTS, the scope of FaCTS, the functions of FaCTS, the target customers of FaCTS, the development strategy for FaCTS, the marketing strategy for FaCTS, and specific aspects of FaCTS that differentiate it from other programs on the market.  This information qualifies for trade secret protection under the DTSA.

34.     PLC's trade secrets relating to FaCTS provide PLC with an actual and potential economic advantage from not being generally known, and not being readily ascertainable by proper means, by other persons or entities who would obtain an economic advantage if they received access to them.

35.     In March and May 2020, Mr. Clark's employment and association with PLC, respectively, ended as he resigned from his position as CEO and Chairman of the Board of Directors.   Only a few weeks later, PlotBox appointed Mr. Clark as Chairman of its Board of Directors.   PlotBox is a direct competitor of PLC in the death care industry, specifically in developing and marketing an industry-specific software technology tool that competes against FaCTS, which PLC is developing and will soon market commercially.   PlotBox was aware that PLC was developing FaCTS for internal use and external sale before it hired Mr. Clark.

36.     Nevertheless, PlotBox recruited and ultimately brought Mr. Clark on as Chairman of its Board, not only because of his general knowledge about PLC's strategy in the death care industry, but also because of his specific knowledge about FaCTS—which, upon information and belief, is the sole focus of PlotBox's business.   Indeed, PlotBox's own press release strongly indicates that Mr. Clark's value is in the knowledge he obtained during his employment with PLC:

- [Clark] brings an incomparable wealth of experience and strategic vision to the business having led one of North America's largest death care operations, Park Lawn Corporation from July 2013 to March 2020.

- With the scale of operation and speed of growth Park Lawn Corp achieved under [Clark]'s leadership, his appointment is a particularly strong endorsement for Plotbox.

- [Clark] is a prominent and hugely respected figure in the death care space, having led Park Lawn Corporation form 6 Toronto based locations to over 300 across Canada and the US with an enterprise value of almost $1 B.

37.     PlotBox has willfully and maliciously misappropriated PLC's trade secrets by acquiring them through improper means by inducing Mr. Clark disclose those secrets to undercut PLC's development of its Software.   PlotBox took these actions with the intent to harm PLC's business by inhibiting the manner in which it will be able to compete against PlotBox.

38.     Mr. Clark's deliberate disregard for his post-employment obligations under various agreements, and PlotBox's malicious actions regarding the same, demonstrates that PlotBox will

14

continue to actually misappropriate and threaten to misappropriate PLC's trade secrets to the detriment of PLC's business and in furtherance of PlotBox's business.

39.     Unless enjoined, PlotBox's misappropriation and threatened misappropriation of PLC's trade secrets will cause irreparable harm to PLC, for which it cannot be fully and adequately compensated.

## Count II
### (Intentional Interference with Employment Agreement)

40.     PLC incorporates each of the facts and allegations detailed above as though fully set forth herein.

41.     PLC had a valid non-compete agreement with Mr. Clark.  The non-compete agreement prohibited Mr. Clark from (among other things) having a financial interest or becoming commercially involved in any endeavor, activity, or business that is substantially the same as or in competition with PLC through August 31, 2021.  In short, as the former Chairman and CEO of PLC, Mr. Clark is restricted from working as the Chairman of PlotBox, or for PlotBox in any capacity, through August 31, 2021.  These restrictions are reasonable and thus enforceable.

42.     PLC also had a valid and enforceable confidentiality agreement with Mr. Clark. The confidentiality agreement prohibits Mr. Clark form disclosing or improperly using the confidential information and trade secrets to which Mr. Clark received access during his employment and association with PLC.

43.     PlotBox knew or had reason to know of the restrictive covenants that Mr. Clark owes PLC by nature of the size of PLC and the position that Mr. Clark held during his employment with PLC.  Indeed, Mr. Clark presumably made PlotBox aware of these restrictive covenants and PlotBox chose to ignore them.

44.     PlotBox willfully and intentionally interfered with the restrictive covenants that Mr. Clark owes PLC.

45.     PLC has suffered and will continue to suffer damages as a proximate result of PlotBox's actions, for which it cannot be fully and adequately compensated unless PlotBox is enjoined as requested below.

### Count III
### (Aiding and Abetting Mr. Clark's Breach of Fiduciary Duties)

46.     PLC incorporates each of the facts and allegations detailed above as though fully set forth herein.

47.     As the former Chairman and CEO of PLC, Mr. Clark owed and continues to owe PLC a number of contractual and common law fiduciary duties, including, but not limited to, duties of loyalty and care.

48.     PlotBox knew and had reason to know that Mr. Clark owed and continues to owe a number of contractual and common law fiduciary duties to PLC, including, but not limited to, duties of loyalty and care.

49.     Despite knowing about Mr. Clark's common law and contract fiduciary duties to PLC, PlotBox knowingly induced Mr. Clark to breach those duties and actively participated in Mr. Clark breaching those duties.  PlotBox committed several actions in furtherance of the breach of those fiduciary duties, including, but not limited to, participating in clandestine meetings in Scotland and Florida to discuss Mr. Clark's future role as Chairman of PlotBox; encouraging and otherwise participating in Mr. Clark soliciting Mr. Parker to join PlotBox; encouraging and otherwise participating in Mr. Clark soliciting other PLC employees to support PlotBox, to the detriment of PLC; and encouraging and otherwise participating in Mr. Clark no longer acting in the interests of PLC and acting in the interests of PlotBox—all while still employed by PLC.

50.     PlotBox knew that its discussions, meetings, and actions with Mr. Clark were aiding and abetting in direct breach of Mr. Clark's contractual and common law fiduciary duties owed to PLC.  But for PlotBox's actions and inactions, Mr. Clark would not have breached the duties that he owed to PLC.

51.     PLC has suffered and will continue to suffer damages as a proximate result of PlotBox's actions.

### ATTORNEYS' FEES

52.     As a result of PlotBox's willful and malicious misappropriation of PLC's trade secrets, as discussed herein, PLC seeks to recover its attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

### JURY DEMAND

53.     PLC hereby requests a trial by jury on its claims against PlotBox.

### RELIEF REQUESTED

PLC respectfully requests that the Court:

a.      Order expedited discovery in preparation for a preliminary injunction hearing;

b.      After a hearing, issue a preliminary injunction as requested above pending a trial on the merits;

c.      After a trial on the merits, award PLC actual, consequential, and punitive damages;

d.      After a trial on the merits, award PLC permanent injunctive relief;

e.      Award PLC its attorneys' fees and costs of suit; and

f.      Grant PLC all other relief, at law or equity, to which it may be entitled.

Dated: October 30, 2020

MORGAN, LEWIS & BOCKIUS LLP

/s/ Jody C. Barillare

Of Counsel:

Nancy L. Patterson (*pro hac forthcoming*)
Michael P. Jones (*pro hac forthcoming*)
John P. Bramble (*pro hac forthcoming*)
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX  77002
T:  +1.713.890.5000
nancy.Patterson@morganlewis.com
michael.Jones@morganlewis.com
john.bramble@morganlewis.com

Jody C. Barillare (#5107)
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
T: +1.302.574.3000
jody.barillare@morganlewis.com

*Attorneys For Plaintiff Park Lawn Corporation*